## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| Pine Petroleum, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| S. Jean Ekern and Clara Louise Rasmussen, | ) | |
| | ) | Case No. 4:12-cv-079 |
| Defendants. | ) | |

On September 12, 2012, plaintiff Pine Petroleum, Inc. ("Pine") moved for summary judgment. (Doc. No. 21). The court deferred ruling on the motion to allow defendants an opportunity to conduct discovery. Thereafter, on May 8, 2013, Pine renewed its motion. (Doc. No. 33). Following this motion, defendants moved to amend their answer and Pine supplemented its motion with additional affidavit information. On September 10, 2013, the court held a hearing on the pending motions, after which the court allowed time for supplemental filings by defendants because of new matters raised by Pine's supplemental affidavit. The court also granted defendants' motion to amend their pleadings.[1]

**I.     BACKGROUND**

Unless otherwise indicated, the following facts have either been agreed to or are not subject to dispute:

---

[1] Defendants submitted their proposed amended answer with their motion. Although defendants overlooked formally serving the amended answer after the court granted leave to amend, the additional defenses set forth in the amended answer will be considered herein since Pine did receive a copy of the proposed amended answer and the defenses have been the subject of the briefing by the parties.

1

A.  **Defendants' acquisition of their mineral interests and the "1972 Lease"**

Defendants acquired their mineral interest by a mineral deed dated May 2, 1967, in which Edwin and Edith Sanders conveyed the minerals in the following lands to their three children - Roger Sanders, Jean Ekern and Clara Rasmussen:

Township 150 North, Range 101 West
Section 1: SW¼SE¼
Section 2: S½NE¼, SE¼
Section 3: Lots 1, 2, S½NE¼, SE¼, E½SW¼
Section 11: N½NE¼
Section 12: All, less that part of the SE¼SE¼ South of Railroad Tracks
Section 19: Lots 3, 4, E½SW¼
Township 151 North, Range 101 West
Section 34: S½SE¼
Township 150 North, Range 100 West
Section 6: Lots 4, 5, 6, 7, SE¼SW¼, SW¼SE¼, E½SE¼
Section 7: Lots 1, 2, 3, 4, E½W½, E½
Section 8: SW¼, S½SE¼
Section 9: W½SW¼

On July 12, 1972, Roger and his wife Betty leased the above mineral acreage to Rainbow Resources, Inc. The oil and gas lease (hereinafter the "1972 Lease") granted to Rainbow Resources was ratified by Jean Ekern and Clara Rasmussen on September 1, 1972. Important to this case is that the 1972 Lease was extended by production from one or more wells located on the leased tracts.

B.  **The "2010 Leases" at issue in this case**

   1.  **The March 9, 2010 lease**

On March 9, 2010, defendants each executed separate oil and gas leases that leased to Pine's contractor, Black River Energy, LLC, ("Black River"), the following lands included in the 1972 Lease:

Township 150 North, Range 101 West, 5th PM
Section 1: SW4SE4
Section 2: S2NE4, SE4

Section 11: N2NE4

In consideration, Pine (in Black River's name) paid Ekern and Rasmussen bonuses of $31,002.00 each on July 2, 2010 from Pine's bank account.

### 2. The March 16, 2010 lease

On March 16, 2010, Ekern and Rasmussen again executed separate oil and gas leases that leased to Pine's contractor Black River the following additional lands included in the 1972 lease:

Township 150 North, Range 101 West, 5th PM
Section 12: All, except that portion of the SE4SE4 containing the townsite of Rawson.

In consideration, Pine (in Black River's name) paid Ekern and Rasmussen bonuses of $68,784.00 each from Pine's bank account. The payment was made on April 21, 2010, to Ekern and on April 23, 2010, to Rasmussen.

### 3. The April 7, 2010 "top leases"

On April 7, 2010, Ekern and Rasmussen for a third time executed separate leases that leased to Pine's contractor, Black River, the following lands included in the 1972 lease:

Township 150 North, Range 101 West, 5th PM
Section 3: Lots 1, 2, S2NE4, SE4, E2SW4

Unlike the earlier leases, the two April 7, 2010 leases bear the label "Top-Lease" and each has an attached rider marked Exhibit A, which, in part, states:

> It is understood by Lessor and Lessee that there is presently outstanding a recorded Oil and Gas Lease . . . whose *primary term* has not yet expired and which covers the lands described in the attached lease. It is the intent of the Lessor and Lessee herein that the attached lease will commence only when the existing lease has terminated.

(emphasis added). The riders state that the top lease will commence on "6-12-2010" if the existing lease (herein referred to as the "bottom lease") terminates upon expiration of its primary term.

Notably, the 1972 Lease was well beyond its primary term when the April 7, 2010 leases were granted. However, with respect to the lands covered by these two leases, there was a second lease outstanding that was still in its primary term, but which was due to expire prior to June 12, 2010. It was this second or bottom lease that the rider was referring to and not the 1972 Lease.

The riders to the two April 7, 2010 leases provided for the payment of the lease bonus in two installments - 20% upon execution of the lease and 80% within 30 days of the termination of the bottom lease. In consideration for these two leases, Pine (in the name of Black River) paid Ekern and Rasmussen the first bonus installment of $2,488.80 on May 14, 2010, to Ekern and on May 12, 2010, to Rasmussen from Pine's bank account. In addition, Pine (in the name of Black River) paid the second installment of $9,955.20 on July 2, 2010, to Ekern and on July 21, 2010, to Rasmussen from Pine's account.

### 4. Rights with respect to the 2010 leases

When Pine arranged for the acquisition of the 2010 Leases in the name of Black River, it was really acquiring them for Murex Petroleum Corporation ("Murex"). The reason that Pine, which at the time was Great Northern Energy, Inc. ("Great Northern"), used Black River to acquire the leases was because it was known in the industry that Great Northern was Murex's leasing agent and, for these acquisitions, it wanted to keep Murex's involvement confidential. After the leases were acquired, they were assigned to Murex. Later, when Murex decided to divest itself of some of its interests and attempted to market the leases, it learned they were ineffective because the 1972 Lease was being held by production. Murex then demanded that Pine pay back the bonus money, which Murex had earlier reimbursed Pine. This led to the filing of this action.

After the court questioned Pine's status, Pine obtained an assignment of the leases from Murex in September 2013, just prior to the court's hearing on the motion for summary judgment. Notably, defendants do not now contest that Pine holds the rights to enforce the claims being asserted in this case.[2]

The 2010 Leases were all recorded at the time they were taken and there is no indication that they have been released from record, much less extinguished. The 2010 Leases each have a primary term of five years; thus, they have not yet expired by their terms.

### C. The "conveyancing" and "warranty" language in the 2010 leases and the "1972 Lease" being held by production

In each of the above 2010 Leases, the "conveyancing clause" reads, in part, as follows:

That the Lessor . . . has *granted*, demised, leased and let, and by these presents does *grant*, demise, lease and let exclusively unto the said Lessee . . . .

(emphasis added). In addition, each of the Leases contains a separate warranty clause that, in relevant part, reads: "Lessor hereby warrants and agrees to defend the title to the lands herein described . . . ."

Notably, there is no dispute that the 1972 Lease was held by production and to this day remains in effect.

## II. DISCUSSION

### A. Pine's claim for breach of warranty

Pine contends that the continued effectiveness of the 1972 Lease constituted a breach of the warranty of title under the 2010 Leases. That is, defendants did not have the right to grant the

---

[2] The court gave defendants an opportunity to raise any issues regarding Pine's status following the hearing on the motion for summary judgment, but they elected not to do so - most probably because it likely is of little practical import given the assignment of the leases to Pine.

exclusive right to explore and drill for oil and gas on the lands covered by the 2010 Leases because the 1972 Lease continued.

Pine contends that the appropriate remedy under North Dakota law for this breach of warranty is recovery of the amounts it paid in bonus to defendants for the 2010 Leases along with interest. For authority, Pine cites to N.D.C.C. § 32-03-11:

> **§ 32-03-11. Damages for breach of covenants in grants**
> The detriment caused by the breach of a covenant of seizin, of right to convey, of warranty, or of quiet enjoyment, in a grant of an estate in real property, is deemed to be:
> 1. The price paid to the grantor, or if the breach is partial only, such proportion of the price as the value of the property affected by the breach bore at the time of the grant to the value of the whole property.
> 2. Interest thereon for the time during which the grantee derived no benefit from the property, not exceeding six years.
> 3. Any expense properly incurred by the covenantee in defending the covenantee's possession.

As will be discussed in more detail in a moment, the court agrees that the warranty language in the 2010 leases encompasses the common-law covenants of seizen and title. Further, the court agrees that, absent an applicable defense, the continued existence of a superior lease would constitute a breach of these covenants. Consequently, the court will turn to the defenses asserted by defendants and, more particularly, whether they raise any material issues of disputed fact that must be resolved by the jury.

### B.  Defenses asserted by defendants

#### 1.  Defendants' claim that the warranty clause is vague and ambiguous

Defendants argue that the warranty clause "is complex and confusing to a layperson" and "vague and subjective as to what 'warrant' actually means." In particular, defendants argue the jury should decide whether they agreed to warrant anything more than that they owned the mineral acres

they were leasing and, material to this case, guaranteed that any prior leases which may have been given were not currently held by production. Or, to state it somewhat differently, defendants argue there is a fact question over whether the "deal" in this case was that Pine assumed the latter risk.

The standard-form "warrants and agrees to defend title" language in oil and gas leases has generally been construed by courts and treatise writers as encompassing what, at common law, are the covenants of seizen and title. See, e.g., Ralston v. Thacker, 932 S.W.2d 384, 386-87 (Ky. Ct. App. 1996) ("Ralston"); Cassard v. Campbell, 425 S.W.2d 523, 524-27 (Ark. 1968) ("Cassard"); see generally 4-52 Kuntz, Law of Oil and Gas § 52.2 (current through April 2013) ("Kuntz"); 4-6 Williams & Meyers, Oil and Gas Law § 685.1 (current through Dec. 2013) ("Williams & Meyers"). And, while the parties here have not cited to any North Dakota case construing this language in the context of an oil and gas lease, there is no reason to believe the North Dakota Supreme Court would reach a different conclusion. Cf. Acoma Oil Corp. v. Wilson, 471 N.W.2d 476, 480-83 (N.D. 1991) (construing "warrant and defend title" language in a mineral deed to include a warranty of title); Aure v. Mackoff, 93 N.W.2d 807, 810-11 (N.D. 1958) (construing the language "agree to warrant and defend the title" in an assignment of royalty arising out of an oil and gas lease to include a covenant of warranty of title).

In short, the language "warrants and agrees to defend title" is not ambiguous, and the fact defendants may not have fully understood it is immaterial absent fraud, mistake, or other grounds for avoiding the leases. Cf. PLM Inv. Management, Inc. v. Dakota Southern Ry. Co., 930 F.2d 1333, 1336 (8th Cir. 1991) (having signed the agreement the party is charged with knowledge of its contents); J.I. Case Threshing Mach. Co. v. Erickson, 131 N.W. 269, 270 (N.D. 1911) (same); see, generally, E. Allan Farnsworth, Farnsworth on Contracts §§ 3.6-3.7 (4th ed. 2004) ("Parties to

7

agreements, especially routine ones, often fail to consider the legal consequences of the actions by which they manifest their assent. The fact that one gives the matter no thought does not impair the effectiveness of one's assent, for there is no requirement that one intend or even understand the legal consequences of one's actions."); 17A Am. Jur. 2d Contracts § 347 (last updated Nov. 2013) ("The court will not attempt to ascertain the actual mental processes of the parties in entering into the particular contract; rather the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.").

### 2. Defendants' claim that the warranty was vitiated by Pine's negligence

Defendants proffered evidence suggesting that someone on behalf of Pine was aware of the 1972 lease and that the acquisition of the 2010 Leases was the result of its negligence. More specifically, the evidence relied upon by defendants is: (1) that an independent contractor performed a title search prior to the 2010 Leases being acquired; and (2) the notes of the independent contractor make reference to the 1972 Lease and the fact it was being held by production. The implication of this evidence was either that the independent contractor's staff failed to make note of the 1972 lease when it uploaded the title information into Pine's software program or that someone from Pine overlooked the information when the 2010 Leases were acquired. Defendants argue that Pine's claim for breach of warranty is foreclosed by the negligence of it or its contractor, and that, if there is any question about Pine's negligence, it is an issue for the jury.

Defendants have not cited any authority for the argument that negligence is a defense to a claim for breach of a contractual warranty of title. And, in North Dakota, it would appear that negligence would not be a defense. See, e.g., Leno v. K & L Homes, Inc., 2011 ND 171, ¶17, 803 N.W.2d 543. ("[f]ault and modified comparative fault do not apply where the cause of action arises

solely out of the contract between the parties"). In fact, as discussed next, Pine's awareness of the 1972 Lease would not, by itself, bar the claims for breach of warranty.

### 3. Defendants' arguments premised upon Pine's alleged awareness of the 1972 Lease

Defendants argue that Pine should not be entitled to recover because it was aware of the 1972 Lease when it acquired the 2010 Leases. In making this argument, defendants rely upon the evidence outlined above. They also contend that Pine admitted its prior knowledge in its briefing.

While there is evidence suggesting Pine *may* have been aware of the 1972 Lease when it acquired the 2010 Leases (*i.e.*, the independent contractor may have forwarded the correct information and it was overlooked by one of Pine's employees), it is not entirely clear that Pine has admitted to having prior knowledge in its briefing. Rather, it appears the only thing that Pine admitted to in its brief was that either it knew or should have known of the prior existence of the 1972 Lease given the title work performed by its independent contractor. In addition, the principal of Pine in his deposition contended that Pine did not have prior knowledge and blamed the lack of correct title information on the failure of its contractor to upload the correct information into its system. But, even if Pine was aware, mere knowledge of the 1972 Lease and the fact it was being held by production would not by itself be sufficient to negate a claim for breach of warranty. See, e.g., Cassard, 425 S.W.2d at 527; Ralston, 932 S.W.2d at 387-88; Oklahoma City v. Harper, 180 P.2d 162, 164 (Okl. 1947) ("Oklahoma City"); cf. Acoma Oil Corp. v. Wilson, 471 N.W.2d 476, 482 (N.D. 1991); see generally 4-52 Kuntz § 52.2; 4-6 Williams & Meyers § 685.1. Rather, something more must be proved, such as waiver or estoppel. See id.

####    4.   Defendants' equitable arguments

Defendants do not appear to make an argument for waiver as distinguished from estoppel. But, even if they do, they have failed to proffer evidence sufficient to create a jury issue of an intentional waiver of rights under the warranty clause. Cf. Wenco v. EOG Resources, Inc., 2012 ND 219, ¶ 19, 822 N.W.2d 701 (waiver is a voluntary and intentional relinquishment of a known existing right). The mere fact that Pine acquired title information and made payment is not enough since these acts are not inconsistent with it also wanting a warranty of title. One of the obvious reasons why a lessee may desire a warranty of title, even if the lessee has checked title in advance, is that it provides "belt and suspenders" protection from mistakes like what occurred in this case. Also, the fact that Pine caused the leases to be recorded does not evince an intentional acceptance of title (much less here an intentional waiver of a rights under a warranty clause) since the primary purpose of recording an instrument is to give notice to third parties of what rights a party may have. Martin v. Turner Oil & Gas Properties, Inc., No. 1:11-cv-102, 2013 WL 1183786, at ** 3-4 (D.N.D. Mar. 21, 2013).

As for defendants' claim for estoppel, which is that defendants relied upon the fact that Pine's leasing agents wanted to acquire the acreage as suggesting that defendants held land that was open for leasing, defendants have failed to offer evidence sufficient for a jury to consider that Pine's leasing agents actually represented that their acreage was open for leasing. Moreover, even if that had been represented to defendants, it would not be enough because, in order to prevail on an argument of estoppel, defendants would also have to show (1) that they did not have actual or constructive knowledge of the real facts and (2) that they changed their position to their detriment. Cf. Thimjon Farms Partnership v. First Intern. Bank & Trust, 2013 ND 160, ¶ 18, 837 N.W.2d 327.

Here, defendants would necessarily have had, at least, *constructive* knowledge of the 1972 Lease and the fact it was being held by production. In addition, defendants have not put forward evidence of any change of their position to their detriment. See Cassard, 425 S.W.2d at 526-27 (stating it was the lessee (and not the lessor) who had changed his position by paying bonus money to the lessor for something the lessor had already sold and did not own). In short, even if Pine's leasing agents had represented to defendants that the lands in question were open for leasing, this would not be enough to vitiate the warranty of title. See also Walker & Withrow, Inc. v. Haley, 653 P.2d 191, 193 (Okl. 1982) (alleged representation by lessee that land was open for leasing did not estop lessee from recovery for breach of warranty of bonus paid for oil and gas lease where an earlier lease was held by production).

### 5. The fact the April 7, 2010 leases were "top leases"

The mere fact that the April 7, 2010 leases were specifically intended to be top leases does not render meaningless the warranty language of the leases. The riders to the two leases contemplated only the presence of the bottom lease whose primary term had not yet expired and which, as discussed earlier, was not the 1972 Lease. So, while the presence of the bottom lease would not give rise to a claim for breach of warranty, the same is not true for the 1972 Lease. Its existence and continued effectiveness rendered ineffective the April 7, 2010 top leases and gave rise to a claim for breach of warranty. See Siniard v. Davis, 678 P.2d 1197, 1198-1200 (Okl. Ct. App. 1984) ("Siniard") (reaching the same conclusion under comparable circumstances).

### 6. Summary

The court concludes that the defenses asserted by defendants fail either as a matter of law or because defendants have failed to come forward with facts sufficient to create a jury issue.

Hence, Pine is entitled to relief for the breaches of the express warranties of title contained in the 2010 Leases.[3]

### C. Relief to be awarded to Pine

More troublesome is the relief that should be awarded to Pine. Notably, this is not a case where the mineral owners did not have title to the mineral acres they were leasing, so there would be no circumstances under which leases could become effective. In this case, while the parties agree that the lands covered by the 1972 Lease were held by production on the date the 2010 Leases were granted and have been held by production since that time, arguably, this state-of-affairs was not a foregone conclusion during the time the 2010 Leases have been outstanding. For example, the person or entity holding the rights under the 1972 Lease could have released them. Also, production could have ceased and not been resumed within the time period required under the 1972 Lease for it to continue. If either occurred, the 1972 Lease would no longer have been effective and the holders of the 2010 Leases would presumably then have had the exclusive right to explore for and develop the mineral acreage covered by the leases.

While the matter is not without doubt, the court predicts the North Dakota Supreme Court would permit recovery of 100% of the total amount of the bonus paid - at least in the absence of evidence of Pine, Black River, or Murex having affirmatively made use of its leases - given that N.D.C.C. § 32-03-11 provides for such a recovery if the breach is total. Also, this is the approach taken by other courts under comparable circumstances. See Siniard, 678 P.2d at 1198-1200;

---

[3] Having reached this conclusion, the court need not address Pine's other argument for breach of warranty which is that the use of the word "grant" in the conveyancing clause of the 2010 Leases gave rise to the implied warranties set forth in N.D.C.C. § 47-10-19. Whether that statute applies to the use of the word "grant" in an oil and gas lease has not yet been definitively decided by the North Dakota courts. See Tank v. Burlington Resources Oil and Gas, Co., LP, No. 4:10-cv-088, 2011 WL 2600458, at ** 5-10 (D.N.D. June 28, 2011).

Cassard, 425 S.W.2d at 526-27; cf. Oklahoma City, 180 P.2d at 164; see generally 4-52 Kuntz § 52.2; 4-6 Williams & Meyers § 685.1.[4]

Pine's request for interest, however, is more problematic. This is because § 32-03-11 provides for an award of interest for "the time during which the grantee derived no benefit from the property" and in this case the holders of the 2010 Leases arguably enjoyed at least the possibility the 1972 Lease might have been released or expired by its terms. While there are no North Dakota cases on point, the court believes the North Dakota Supreme Court would not allow a lessee in this situation (either intentionally or otherwise) to speculate on whether the lease might become good by retaining the lease until late in the game, or even after it has expired, and then asking for interest back to the date when the bonus was first paid. Cf. Bowne v. Wolcott, 48 N.W. 336, 338 (N.D. 1891) (noting the unfairness of allowing a grantee to recover 100% of the consideration paid for property as a measure of damages under the predecessor to N.D.C.C. § 32-03-11 while at the same

---

[4] Another possibility, which has some appeal, would be to limit Pine's damages to a sum calculated by multiplying the bonus paid for each lease times a fraction the numerator of which would be the total number of days remaining in the primary term after the demand was first made for return of the bonus and the denominator being the total number of days of the primary term. However, no case has been cited for calculating damages in this fashion.
    In allowing damages equivalent to 100% of the bonus amounts, the court assumes that, upon payment of the judgment amount, defendants could insist that the 2010 Leases be released or otherwise extinguished and, if Pine did not do so, defendants would be entitled to judicial relief. This is the import of several cases cited with approval in Bowne v. Wolcott, 48 N.W. 336, 338 (N.D. 1891) where the North Dakota Supreme Court expressed concern over awarding a grantee 100% of the consideration paid for property in the event of a breach of warranty where the grantee was to continue in possession. For example, in one of the cases cited in Bowne, the Tennessee Supreme Court stated with respect to recovery of the consideration paid as damages for a breach of warranty:
> Such is the proper measure of damages only where there is an entire failure of title, or where the purchaser has an election to treat it as such. And in the latter case the effect of a recovery of an equivalent in damages would be to entitle the bargainor to a reconveyance; and this, if refused, a court of equity would enforce, and perhaps the effect of such recovery of damages would be, by operation of law, to revest the title in the bargainor without more.

Kincaid v. Brittain, 37 Tenn. 119, 124, 1857 WL 2564, at *2 (Tenn. 1857); see also Frazer v. Board of Sup'rs of Peoria County, 74 Ill. 282, 291-92, 1874 WL 9124, at *5 (Ill. 1874); see generally Annot., Measure of damages for breach of covenants of title in conveyances or mortgages of real property, 61 A.L.R. 10, § V(a)(2) (1929).

time retaining the property and concluding that the damage remedy provided by the statute may be tailored to meet the circumstances).

In this case, the first evidence of any demand being made of defendants for return of the bonus money by Pine, Black River, or Murex is when Pine filed this action on June 19, 2012, which is some two years after the 2010 leases were acquired. Even then, Pine's demand was not accompanied by an offer to return or otherwise release the leases. In fact, when Pine filed this action, it did not control them. It was not until very recently that Pine, for the first time, acquired the leases in its name.[5] Under these circumstances, the court concludes that Pine has failed to demonstrate an entitlement to interest. Cf. Siniard, 678 P.2d at 1201 (requiring return of the bonus amount paid pursuant to an Oklahoma damage statute identical to North Dakota's but declining to award interest); Cassard, 425 S.W.2d at 469 (concluding that proper measure of damages would be the amount of bonus paid but declining to award interest).[6]

With these determinations, the court will award Pine damages as to each defendant in an amount equal to the total of the bonuses paid the defendant for the 2010 Leases, which is $112,230.00.

## III.   CONCLUSION AND ORDER FOR JUDGMENT

Based on the foregoing, Pine's motion for summary judgment (Doc. Nos. 21 & 33) is **GRANTED**, and it is hereby **ORDERED, ADJUDGED, AND DECLARED** as follows:

---

[5] It appears that, even though Pine acquired the leases, it has yet to pay anything to Murex.

[6] Even if the court was inclined to award interest, the earliest date upon which it would do so based on the record is when this action was first filed on June 19, 2012. As for any argument by Pine (or derivatively Murex) that it would be unfair not to award interest back to the time the bonuses were paid, since the 1972 Lease never expired, Pine or Murex could have at any time demanded the return of its bonus money (and upon payment released the leases) and that neither of them did so was totally within their control.

1. Pine is entitled to judgment against defendant S. Jean Ekern in the amount of $112,230.00.

2. Pine is entitled to judgment against defendant Clara Louise Rasmussen in the amount of $112,230.00.

3. Each party shall bear its own costs.

Dated this 30th day of January, 2014.

                                                 */s/ Charles S. Miller, Jr.*
                                                 Charles S. Miller, Jr.
                                                 United States Magistrate Judge